UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TINA BONNEAU

    Plaintiff

v.

STATE UNIVERSITY OF NEW YORK AT BROCKPORT,
    Defendant
_____

Dkt. No. 11 cv.6273
AMENDED COMPLAINT

JURY TRIAL DEMANDED,

# JURISDICTION

1. This is an action brought for redress of discriminatory conduct against a branch of the State University of New York, under Titles II and III of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., and the Rehabilitation Act, 29 U.S.C. § 794 et seq.. Jurisdiction is based on 28 U.S.C. § 1343.

# VENUE

2. Venue is laid in the Western District of New York, where the acts complained of occurred and where the parties reside.

# PARTIES

3. At all times mentioned herein, Plaintiff, TINA BONNEAU, was a citizen of the United States residing in New York. At all times mentioned herein she was a person with disabilities

within the meaning of the Americans with Disabilities Act, and the Rehabilitation Act.

4. Defendant State University of New York at Brockport ("SUNY-Brockport") was at all times mentioned herein a branch of the State University of New York.  At all times mentioned herein it was a recipient of federal funds.

## FACTS

5. At all times mentioned herein, Debra Fisher, Melissa Brown, and Phyllis Kloda were professors employed by Defendant SUNY-BROCKPORT.  At all times mentioned herein they acted within the scope of their employment, as agents of Defendant SUNY-BROCKPORT. At all times mentioned herein, Virginia Bacheler and Karen Logsdon were administrators employed by Defendant SUNY-BROCKPORT.   At all times mentioned herein they acted within the scope of their employment, as agents of Defendant SUNY-BROCKPORT.

6. In the Fall of 2007, Plaintiff, who had been a student at Defendant SUNY-BROCKPORT, was readmitted and resumed her studies there as a Psychology major.

7.  Prior to the Spring semester, Plaintiff added a second major in Studio Art with a concentration in Painting.

8. In the Spring semester, beginning in January, 2008, Plaintiff notified the SUNY-BROCKPORT Office for Students with Disabilities ("OSD") that she was disabled by Post-Traumatic Stress Disorder and Panic Disorder, provided medical documentation, and was granted accommodations

9. Plaintiff requested, and was granted, the accommodations of extended testing times,

permission to take short breaks during classes and assistance with getting any notes missed during those breaks. The Plaintiff was granted those accommodations due to her disabling conditions, Post-Traumatic Stress Disorder and Panic Disorder, and she was receiving treatment for these and Generalized Anxiety as well.

10. Plaintiff had been ruled disabled by the Social Security Administration and receives Social Security Disability Benefits for her psychiatric disabilities, as these disabilities caused substantial impairment in more than one major life activity, including work.

12. Plaintiff experienced substantial impairments in several major life activities due to her recognized disabilities and was undergoing treatment for those impairments during her enrollment at SUNY Brockport.

13. The Plaintiff's Post-Traumatic Stress Disorder caused impairment in her ability to sleep, nightmares and exhaustion on occasion, contributing to an overall high level of anxiety and difficulty concentrating on cognitive tasks such as reading and retaining new information, thus affecting the amount of time needed to complete specific tasks such as reading and test-taking. Plaintiff's Post-Traumatic Stress Disorder, Panic Disorder and Generalized Anxiety caused Plaintiff to experience traumatic flashbacks that were disturbing to the Plaintiff, but not outwardly disruptive to others, a sense of panic, and a high behavioral baseline of anxiety that was managed by techniques learned in therapy. The short breaks from class as needed were to be used for the purposes of practicing the anxiety management techniques in private, so that the Plaintiff could return to the classroom to resume activities.

14. The aforementioned impairments are chronic in nature. The Plaintiff's impairments

developed over an extended period of time in early life, were instigated by multiple severe traumas that were then exacerbated by years of misdiagnosis, traumatic experiences with inappropriate medications, and other harmful treatments in the mental health system, such as extensive hospitalizations caused by the effects of the inappropriate medications given for the Plaintiff's misdiagnosed condition. As a result, the Plaintiff has carefully chosen her mental health care providers, working only with those who specialize in trauma-informed care and acknowledge the trauma she previously underwent in the public mental health care systems

15.  At the start of each semester, Plaintiff was required to supply each professor, for whose class she wished to make use of those accommodations, with a letter supplied by the OSD that states that she was a student with a disability, and the professor was required to  sign it in acknowledgment that they knew which accommodations they must provide at Plaintiff's  request.

16.  In Spring 2008, her first semester in the Art Department, when she presented her  accommodation letter to Associate Art Professor Debra Fisher, her  professor for Drawing I, Fisher  inquired as to the specific nature of the disability.  Plaintiff  informed her that she was not required to share that with the professor. However; she did disclose that she has Post-Traumatic Stress Disorder.

17.  Plaintiff made clear to Fisher that the fact of Plaintiff's  PTSD was to be treated as confidential.

18.  Plaintiff did not share the nature of her disability or her diagnosis with any other  professors or administrators in the Art Department.

19. In Spring 2008, Plaintiff, who had become personally friendly with Fisher, privately showed the Professor FIsher some of her pre-art school artwork which was hosted on Plaintiff's anonymous personal weblog ("blog.").

20; Plaintiff did not share the blog with students at that time nor at any time after.

21. Fisher became a regular reader of the blog and learned of many very

personal facts about Plaintiff's mental health history, including childhood traumas and the traumatic, disabling experiences with psychiatry that destroyed her health and nearly ended her life.

22. In Spring 2008, Plaintiff witnessed a very serious argument in Drawing I that occurred between Fisher and a student who subsequently chose to drop the class.

23. Fisher screamed at him to shut up and engaged in heated dialogue in front of the entire class.

24. In Fall 2008, her second semester in the Art Department, Plaintiff was enrolled in

another of Fisher's classes, Printmaking I.

24. During the Fall 2008 semester, Fisher was verbally abusive to a student,

and that student withdrew from the class right before mid-term.

25. That same student was often the subject of disparagement by Fisher in

her private e-mails to Plaintiff.

26. During the Fall 2008 semester. Fisher shared personal information with

Plaintiff, by e-mail, including several students' grades, behaviors and other information that is protected by FERPA.

27, Plaintiff advised SUNY-BROCKPORT administrators of these FERPA violations in Spring 2010. She was challenged to "prove it".

28. During the Fall 2008 semester, Fisher got into another serious classroom altercation with another student, this time in her Printmaking II class. That student was referred to the Student Behavioral Consultant Team ("SBCT").

29. During the Fall 2008 semester, Fisher reduced a young Asian student in Print I class to tears by harshly stating that her idea for her final woodcut about the given topic "Identity" was cliche, asking the student, "Don't you know anything about your heritage?!" The student replied that she did not. She was adopted.

30. In November 2008, Psychology Department Chairperson, Dr. Melissa Brown, made an SBCT referral on Plaintiff after Plaintiff contacted her by e-mail for assistance with a Psychology Department professor who, against college policy, refused to grade a paper because she did not like the "tone". This is the first time the SBCT was used to against Plaintiff to deflect responsibility of a professor at Defendant SUNY-BROCKPORT to adhere to college policy as well as the law.

31. On or about November 21, 2008, Plaintiff wrote on her Blog about incidents on November 11 and November 20, in which Fisher had not respected her personal boundaries, questioning Plaintiff's focus and goals for her artwork and education.

32. Plaintiff decided to end her personal friendship with Fisher.

33. Plaintiff also wrote anonymously on her blog about the incidents of Fisher's inappropriate dealing with students in the classroom.  Fisher showed up the following morning at the blog to read, and returned to read.

34. Fisher returned to the blog obsessively to read that post, and she began to follow Plaintiff's friends' blogs. This went on until Plaintiff saved the blog to a file and deleted it from the wordpress URL.

35.   Fisher was mostly uncommunicative with Plaintiff in class, and was extremely hostile to Plaintiff when she was required to respond to needed information.

36.   Fisher is a highly disliked professor by many students, and her classroom was already tense due to her behavior. Plaintiff influenced no one and turned no one against her.

37.   After agreeing to have Plaintiff leave her final portfolio for grading in a secure location, Fisher reneged on the agreement.  There had been numerous thefts in the department that semester and the previous semester.

38.   Plaintiff contacted Art Department Chairperson Phyllis Kloda on December 1, 2008 to ask for assistance in the matter, and arranged to drop off the portfolio to Fisher on the day she would be grading it, so that it did not remain in an open unattended studio for more than a week before Fisher graded it.

39.   Plaintiff had done larger than required editions and also turned in three non-required editions done on her own time. All of Plaintiff's work was completed on time.

40.  The drop-off date for that portfolio was for the morning of December 8, 2008, and pick-up was to be around 2 pm in the Print studio.

41.  Plaintiff dropped off her graded portfolio at the designated time, and picked it up at the designated time.

42.  When Plaintiff went to retrieve her graded portfolio, Fisher was in the classroom still grading folios.

43.  The studio technician came into the classroom, and Fisher asked to go out into the hallway to talk.  In the hallway, Fisher began to harass Plaintiff about her treatment choices, saying: "There MUST BE some kind of medication you can take!" "That art therapist is not helping you." "Therapy is not helping you." She continued with harassing comments about Plaintiff's treatment choices and insisted that this was the reason Plaintiff chose to end the friendship and possibly leave the Department.

44.  Fisher continued to invade Plaintiff's privacy with google searches for Plaintiff, following Plaintiff's friends' blogs from around the country.

45.  Plaintiff contacted Fisher by e-mail in December 2008, with a warning that Plaintiff would take legal action if Fisher didn't cease, and Fisher apologized, but then continued.

46   When Plaintiff returned to Fisher' classroom to take Print II in Spring 2010, events took place early in the semester that led Plaintiff to disclose Fisher's previous misconduct to Phyllis Kloda.

47. Kloda proceeded to question Plaintiff about her disability, her treatment choices, and made statements to Plaintiff during a total of three hours of harassment and threats on February 2, 2010, that caused Plaintiff extreme emotional distress.  Kloda made statements that included knowledge and misinformation that could only have come from Fisher.

48. Kloda threatened to report Plaintiff to the SBCT if Plaintiff refused to drop Printmaking and take something else.

49. Kloda went on to make that referral two days later on February 4, 2010, asking the administrators if she could have Plaintiff administratively removed based on a list of falsified and fabricated events she had compiled.

50. Kloda specifically stated in that request to the SBCT that she had concerns that Plaintiff was in therapy but not medicated.

51. On February 23, 2010, Plaintiff received an email request from Karen Logsdon, Assistant to the Vice president of Student Affairs and Chairperson of the Student Behavioral Consultant Team, (SBCT) for a meeting with the SBCT saying that Plaintiff was reported as a "Student of Concern".

52. Logsdon repeatedly refused to disclose to Plaintiff the grounds for the referral or the behaviors alleged.  Plaintiff's repeated requests to Logsdon and requests made on Plaintiff's behalf by Plaintiff's therapist went unanswered despite the fact that Plaintiff informed Logsdon that Plaintiff did not feel safe to return to school or to have a meeting without knowing what was behind the referral. At the time of the SBCT referral, the Plaintiff and her therapist both notified Karen Logsdon, that due to her disability and the impairments described, she would not be able

to attend an SBCT meeting in the student counseling center and without a support person present.

53. Plaintiff's fear of what was behind the referral was due to the 2008 harassment by Fisher and the harassment by Kloda, in which Fisher's harassment clearly played a role due to the nature of Kloda's questions and threats in 2010.

54. Both Plaintiff and Plaintiff's therapist spoke with Logsdon on March 3, 2010.

55. Logsdon refused to disclose the nature of the allegations which were the basis of the SBCT referral.

56. Plaintiff requested, as a reasonable modification of the SBCT program, that the meeting take place at a location elsewhere on campus, with the therapist present, rather than at the Health Center Counseling Office, on March 3, 2010 . The Plaintiff's therapist at that time, Courtney Konecny, spoke to Logsdon by phone on March 3rd and 4th of 2010 explaining to Logsdon that due to the way the SBCT matter was being handled, the Plaintiff was experiencing "increasing anxiety at not receiving a response regarding details of a referral made to the SBCT." These phone conversations between Konecy and Logsdon were outlined in a letter from Ms. Konecny to the NY State Division of Human Rights in a letter dated May 10, 2010 describing her interactions with Logsdon. Ms. Konecny stated her hope "that we could come to an amicable solution that would meet Tina's needs." Ms. Konecny also stated that she "let Ms. Logsten know that through choosing to not respond, Tina's anxiety and distress had in fact increased exponentially, which as a result, also kept her from attending her classes." Ms. Konecny stated that, "We discussed Tina's diagnosis of complex PTSD, a detail she stated she was aware of. I

did also explain to Ms. Logsten [sic] that Tina was not feeling safe to attend a meeting with administrators, and felt she would need an advocate present. We did also discuss how this was related to PTSD symptoms." Ms. Konecny went on to describe in her May 10, 2010 statement to the NY SDHR, that during her conversation on March 4th with Ms. Logsden, Logsden said that "due to her Team's busy schedule they could only offer Tina specific meeting times, to ensure that someone from the Counseling Center and the SBCT could attend. I did explain to Ms. Logsten that Tina's disability would make that very difficult for her."  Konecny also stated that Defendant  Logsdon said she "would not be calling Tina again to arrange a meeting with the accommodations Tina had requested".   Logsdon spoke to Plaintiff's therapist again on March 4, 2010 and refused the requested accommodations for the SBCT meeting.

57.    Logsdon stated that she could not help Plaintiff with the fact that Plaintiff was now far behind on her classwork and suggested Plaintiff  contact the OSD for "advocacy".

58. OSD is not set up to provide "advocacy" of this sort.  The problem Plaintiff was encountering of being behind in class work was directly due to the refusal of  Logsdon acting on behalf of Defendant SUNY-BROCKPORT to accommodate Plaintiff's request for an alternate meeting site on campus and her therapist's presence, and to disclose the nature of the allegations, so that Plaintiff could attempt to resolve the issues being raised concerning her alleged behavior and get back to her class work.

59.  On March 9, 2010, Fisher sent an e-mail to Kloda and Bacheler  in which  Fisher alleged that a student told her she knew Plaintiff was "crazy" and might go after Fisher with a gun. In the e-mail,  Fisher also called Plaintiff  a "ticking-time bomb" and stated that Plaintiff needed to be

kept off campus and out of her classroom.

60. Plaintiff met with Bacheler on March 11, 2010. Bacheler insisted on keeping the door open during the meeting, violating Plaintiff's privacy and denying her ordinary civility, much less a reasonable accommodation. During the meeting, Bacheler raised her voice to Plaintiff during the discussion, refused to disclose the grounds for the referral to SBCT, and refused to assist Plaintiff with extending times to allow her to make up the missed work without her attendance grades and late work affecting Plaintiff's overall grades.

61. At the meeting, Bacheler told Plaintiff that she would not be allowed to pass Printmaking no matter what, and that her Painting II grade would be affected.

62. The time away from the college also meant that Plaintiff had missed a language exam she would need to graduate.

63. On March 11, 2010, after the meeting with Bacheler Plaintiff went to the Art Department building, to speak with another professor. Fisher closed the door to her class room and began to discuss Plaintiff with the students in her class, implying that Plaintiff 's presence was a threat to safety, resulting in the suggestion by one student that Fisher call the armed campus police.

64. At that point, Plaintiff left the building terrified and returned home to contact Bacheler by e-mail to notify her of what occurred. Bacheler did nothing about it. Plaintiff could not feel safe returning to her classes after that incident.

65. Plaintiff sent a request to Logsdon on March 11, 2010 to schedule the SBCT meeting and to learn the nature of the allegations, but Logsdon was still insisting that the meeting meet take

place at the campus health center counseling office. Plaintiff reminded Logsdon she would need to provide Plaintiff with the information Plaintiff had requested, and Logsdon again refused to agree to do so. She did not respond to set up the meeting until after Spring break, on or about March 24, 2010. Plaintiff then reminded Logsdon of the necessary accommodations. There was no response from Logsdon..

66. On the afternoon of March 24, 2010, Plaintiff notified Defendant SUNY-BROCKPORT that she would be filing a complaint charging disability discrimination with the New York State Division of Human Rights ("SDHR").

67. Plaintiff filed an administrative complaint with the SDHR on March 29, 2010, complaining of disability discrimination at SUNY-.BROCKPORT.

68. On or about April 1, 2010, Kloda and Fisher sought to lodge student misconduct charges against Plaintiff.

69. The conduct referral was sent to Plaintiff with the other documents she received from Defendant SUNY-BROCKPORT as its answer rebuttal to her administrative complaint through the SDHR on May 1, 2010. It was included as "evidence". The documents Plaintiff received included all of the allegations, which Plaintiff learned of for the very first time from the SDHR documents.

70. Plaintiff was never notified of any adjudication of these allegations of misconduct by Defendant SUNY-BROCKPORT.

71. One of the documents, an e-mail from Fisher to Kloda and Bacheler, dated March 9,

2010 described Plaintiff as "crazy", a" ticking-time bomb", and stated that Plaintiff should be kept out of school. It also alleged that a student told her Plaintiff might come after Defendant Fisher with a gun.

72. There are college policies that outline how to document disruptive events and how to proceed with disruptive students. Those policies were never followed, because the things Plaintiff was accused of doing did not take place.

## AS A FIRST CAUSE OF ACTION

73. Plaintiff repeats as if stated here in full ¶¶ 1-72 of this Complaint.

74. Defendant SUNY-BROCKPORT is a public entity within the meaning of the Americans with Disabilities Act, Title II, 42 U.S.C. § 12131(1).

75. Defendant SUNY-BROCKPORT through its agents, denied Plaintiff a reasonable modification of its programs to accommodate her known disabilities, and treated her less favorably based upon her disabilities, in violation of the Americans with Disabilities Act.

## AS A SECOND CAUSE OF ACTION

76. Plaintiff repeats as if stated here in full ¶¶ 1-75 of this Complaint.

77. At all times mentioned herein, Defendant SUNY-BROCKPORT has been a recipient of federal funds.

78. Defendant SUNY-BROCKPORT through its agents, denied Plaintiff a reasonable modification of its programs to accommodate her known disabilities, and treated her less favorably based upon her disabilities, in violation of the Rehabilitation Act of 1973, 29 U.S..C. §

621 et seq.

## AS A THIRD CAUSE OF ACTION

79. Plaintiff repeats as if stated here in full ¶¶ 1-78 of this Complaint.

80. Defendant SUNY-BROCKPORT retaliated against Plaintiff for her opposition to disability discrimination, by treating her with hostility and denying her equal opportunity to complete her course work, and by referring her to the SBCT, and for her use of the New York State administrative complaint process by filing a complaint with the SDHR, by initiating a disciplinary proceeding against her, in violation of anti-retaliation provisions of the Americans with Disabilities Act and the Rehabilitation Act.

Wherefore Plaintiff respectfully requests an injunction requiring Defendant SUNY-BROCKPORT to take all necessary steps to insure that Plaintiff is able to complete her studies at SUNY-BROCKPORT without being subject to discriminatory or retaliatory treatment, and to 2) purge Plaintiff's academic, disciplinary, and other SUNY-BROCKPORT records of all grades and references which are affected by Defendants' discriminatory and/or retaliatory conduct, and 3) an award of compensatory damages against Defendants jointly and severally for discriminatory and retaliatory conduct, and 4) an award of compensatory damages against the Defendant together with reasonable attorney's fees and costs, and such further, other and different relief as this Court deems just in the premises.

Yours, etc.

/s/
Aaron David Frishberg

                    Attorney for Plaintiff
                    116 W. 111th Street
                    New York, NY 10026
                    212 740 4544

JURY DEMAND

Plaintif hereby demands a trial by jury of all issues triable by jury.

                    /s/

                    Aaron David Frishberg